# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>　　　Plaintiff, )<br>v. )<br>　 )<br>TORRE WILSON, )<br>　　　Defendant. ) | No. 2:20-cr-20119-SHL-1 |

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

Before the Court is Defendant's Motion to Suppress, filed December 5, 2020. (ECF No. 25.) Defendant Torre Wilson seeks to suppress all evidence arising from an alleged illegal search and seizure of Mr. Wilson on January 31, 2020, at a motel in Memphis, Tennessee. (ECF No. 25 at PageID 25; ECF No. 39 at PageID 63.) Specifically, Defendant seeks to suppress the evidence found in the motel room and statements he subsequently made at a police station. (ECF No. 39.) Defendant argues that there was an absence of probable cause to support the issuance of the search warrant and that his statements to police at the Organized Crime Unit's headquarters were un-Mirandized.[1]

The Government responded on December 18, 2020 and March 17, 2021, arguing that the search warrant was supported by probable cause and that Defendant was not interrogated prior to being Mirandized. (ECF Nos. 28, 40.)

---

[1] Defendant initially argued that the search and seizure was unlawful without referencing or acknowledging the underlying search warrant. (ECF No. 25 at PageID 28–29.) In his filing after the hearing, he appears to have pivoted to an argument that the warrant was deficient because it relied on "the bare bones assertion of a reliable informant," which he argues failed to establish probable cause. (ECF No. 39 at PageID 67.)

The Court held an evidentiary hearing on March 5, 2021.  (ECF No. 36.)  The Government called Memphis Police Department Organized Crime Unit Detectives Brandon Baker and Brian Scott as witnesses, and Defendant appeared as a witness.  (ECF No. 36.)  The Government also submitted into evidence the search warrant, return of the search warrant, advice of rights form, and Defendant's statement to police.  (ECF No. 37.)

For the reasons outlined below, Defendant's Motion to Suppress is **DENIED**.

## FACTS

Based on the testimony and exhibits offered at the evidentiary hearing, the Court finds the following facts.

In 2018, an investigation was opened into an individual known by the street name Rambo, in connection with a nonfatal overdose in the Sycamore View area of Memphis, Tennessee.  (Hr'g Tr. 10.) [2]  The name Rambo was connected to other overdoses in the area dating back to 2016.  (Hr'g Tr. 11.)  Through the use of an undercover officer, the Memphis Police Department ("MPD") established Defendant Torre Wilson as Rambo.  (Hr'g Tr. 11.)

In January 2020, Detective Baker established a confidential informant ("CI") who bought drugs from Rambo.  (Hr'g Tr. 11–12.)  The informant was shown to be a reliable informant through two drug purchases from individuals other than Defendant, after which s/he purchased fentanyl from Defendant.  (Hr'g Tr. 11, 12.)  In connection with the purchase from Defendant, Detective Baker watched the CI make a phone call to Defendant, who instructed the CI to come to Room 315 at the Cedar Inn & Suites Motel to purchase the fentanyl.  (Hr'g Tr.13–14.)  After the CI made the drug purchase from Rambo, Detective Baker used that information to get a valid

---

[2] The Court relies, in part, on the unofficial hearing transcript.  The Court does not anticipate that any edits to the final transcript will affect the citations included herein.

search warrant from a Shelby County Judicial Commissioner on January 29, 2020, which was within five days of the purchase. (Hr'g Tr. 14.) Room 315 and Torre Wilson were the targets of the search warrant. (Ex. 1 at 1.)

On January 31, 2020, members of the MPD went to the motel to execute the search warrant. (Hr'g Tr. 16, 17.) Officers observed Defendant and a female drive into the parking lot. (Hr'g Tr. 17.) A child was also with them. (Hr'g Tr. 17.) After Defendant entered the motel and approached Room 315, Detective Baker stopped him before he could enter the room. (Hr'g Tr. 18.) Defendant and the female were searched. Police found contraband on the female that turned out to be cocaine. (Hr'g Tr. 47.) MPD then forced entry into Room 315, which was searched while Defendant stood in the room. (Hr'g Tr. 19–20.)

The return for the search warrant listed the following items found in Room 315: Keltec P3AT .380cal handgun, 6 live .380 rounds, 1 glass pipe, 3 digital scales, 12 syringes, 15.3 TGW marijuana, 11.3 TGW fentanyl, 4.5 TGW cocaine, various cards, plastic bags, and a false bottom Fanta soda can. (Ex. 2.) Detective Baker testified that the three digital scales, some syringes, and the marijuana were found on a coffee table inside the room. (Hr'g Tr. 22.) The fentayl and the majority of the cocaine were found inside the false bottom Fanta soda can. (Hr'g Tr. 23.)

Defendant was transferred to the Organized Crime Unit's headquarters at 225 Channel 3 Drive, Memphis, TN. (Hr'g Tr. 54.) He was placed in an interview room, where one hand was handcuffed to the chair and one leg was handcuffed to a bench where he was sitting. (Hr'g Tr. 54.) Detective Baker and his partner entered the room, and Defendant began to volunteer information. (Hr'g Tr. 54.) The detectives asked Defendant about the narcotics movement in the area, but did not ask him about his own activities. (Hr'g Tr. 56.)

After about 30 minutes of general discussion, the detectives read Defendant his Miranda rights, which he waived a few minutes later. (Hr'g at 56; Ex. 3.) The detectives asked a few general questions and then began to ask what happened that night. (Hr'g Tr. 60.) That conversation was reduced to a written statement, which Defendant signed. (Hr'g Tr. 60, 61.) The officers did not threaten him nor make any promises about what would happen to him if he did not provide a statement. (Hr'g Tr. 63.)[3] Defendant told the officers that Room 315 was his room, that he sold fentanyl but not heroin, that he made approximately $700 to $800 per week, and other details related to drug sales. (Hr'g Tr. 72, 73.) Defendant also advised that the firearm found in Room 315 was his and that he had purchased it off the street. (Hr'g Tr. 72.) The interrogation lasted approximately three hours. (Hr'g Tr. 75–76.)

---

[3] Defendant contends that officers threatened him with the arrest of his girlfriend and placement of his child in Child Protective Services if he did not cooperate and tell officers what they wanted to hear. (ECF No. 25 at PageID 32.) However, Defendant does not restate this argument in his second Memorandum in support of his Motion to Suppress. (ECF No. 39.) Regardless, the Court does not find Defendant's testimony to be credible. Defendant offered incoherent excuses for why he allegedly made numerous false statements to the police when giving his statement, from the incriminating (e.g., that he sold fentanyl but not heroin), (Hr'g Tr. 118), to the mundane and seemingly irrelevant, (e.g., that the car he arrived at the motel in was his uncle's car, when in fact it belonged to a woman who was the mother of another child of Defendant), (Hr'g Tr. 115–16), while allegedly answering some questions truthfully (e.g., that he had previously been convicted of a crime in a court of law), (Hr'g Tr. 127). Finding that Defendant was not credible, the Court does not find that any threats were made.

But even if statements were made regarding the consequences to Susan May, the female with him that day, for being found with cocaine on her person and the immediate need for childcare if both Defendant and Ms. May were detained, such statements would not render Defendant's statements involuntary. See United States v. Daniel, No. CRIM.A. 4:04-CR-017, 2006 WL 753082, at *2 (W.D. Ky. Mar. 22, 2006) ("Informing a defendant that he and his wife could go to jail and that other arrangements would have to be made for the care of their child if the defendant did not cooperate does not render his confession involuntary when these events are merely consequences of defendant's illegal acts. It is not coercive for officers to discuss realistic penalties or results for cooperation or non-cooperation." (internal citations omitted)).

**ANALYSIS**

Two issues are before the Court: (1) whether the CI's information provided sufficient probable cause to justify the search warrant and (2) whether Defendant was properly Mirandized. Defendant argues that the information provided by the CI is insufficient to uphold the search warrant because it "lacks specificity and particularity as to the quantity or location of the illegal drugs . . . , doesn't state that [Defendant] was inside of the room or that the transaction even took place in the room [and is unclear as to] exactly how many buys from Mr. Wilson were made by the informant within that five (5) day period."  (ECF No. 39 at PageID 66.) [4]  The Government argues that Defendant's challenge to the search fails because the search warrant contained probable cause.  (ECF No. 40 at PageID 75.)[5]

Defendant also challenges any use of the statements he made during the period of general discussion before he was read his Miranda rights.  (ECF No. 39 at PageID 63, 69.)  The Government concedes that Defendant was in custody at the time he gave his statement but argues that Detective Scott's questioning before Defendant was Mirandized did not amount to an interrogation.  (ECF No. 40 at PageID 81.)

---

[4] At the hearing, Defendant also questioned the date of the controlled buy, arguing that he had no proof that it was within the five-day time period described in the affidavit.  Although he did not reiterate this argument in his subsequent filing, the Court confirms, based on an in camera review of the documents submitted by the Government, that the fentanyl purchase was made within the five-day period.  (See Ex. 1.)

[5] The Government also asserts that, because he testified at the hearing that Room 315 was not his room and that he had no knowledge of the items inside, Defendant lacks standing to contest the search.  (ECF No. 40 at PageID 74–75.)  Interestingly, Defendant did testify that Room 315 was not his room, (Hr'g Tr. 97–98), which would indeed defeat standing.  However, as the veracity of Defendant's testimony is highly in doubt, the Court finds this testimony unreliable and, as such, concludes that Defendant does have standing.

5

**I.      The Search Warrant**

Defendant argues that the search warrant was deficient and the good-faith exception does not apply. The Government contends that the search warrant contained probable cause, but even if not, the good-faith exception does apply. The Court agrees that the search warrant contained probable cause and thus does not reach the good-faith exception.

To determine whether an affidavit is sufficient to support a finding of probable cause, courts look to the "totality of the circumstances," which includes a confidential informant's "veracity, reliability, and basis of knowledge." United States v. May, 399 F.3d 817, 822 (6th Cir. 2005) (quoting Illinois v. Gates, 462 U.S. 213, 230 (1983)). An affidavit is sufficient "where a known person, named to the magistrate, to whose reliability an officer attests with some detail, states that he has seen a particular crime and particular evidence, in the recent past, [such that] a neutral and detached magistrate may believe that evidence of a crime will be found." Id. at 822–23 (quoting U.S. v. Allen, 211 F.3d 970, 976 (2000)).

Defendant argues that the magistrate had no basis of knowledge of "a particular crime" and "particular evidence," nor any detail regarding the informant's reliability. According to Defendant, "[t]o uphold the warrant in this matter, this court would be stating that any tip provided by an informant who has provided reliable information [to] the police in the past is sufficient to constitute probable cause for the warrant to issue, irrespective of the bare bones, generalized nature of the information provided and without any information other than a blanket statement of police corroboration." (ECF No. 39 at PageID 66.) The Court disagrees, concluding that these arguments are not consistent with the proof.

The affidavit submitted in support of the search warrant recounted that the CI, who previously completed two reliability buys of illegal narcotics, provided Detective Baker with

6

information that fentanyl and crystal methamphetamine were "being stored and sold out of [Room 315 of the Motel], by a male black . . . Torre Wilson" and that the CI "purchased fentanyl from Torre Wilson, within the past (5) days and affiant has conducted a controlled buy of fentanyl from Torre Wilson."  (Ex. 1.)  Detective Baker further stated in the affidavit that detectives conducted surveillance and recovered narcotics from the CI, and that they observed foot traffic consistent with narcotics crime.  (Ex. 1.)  Detective Baker also detailed his computer investigation into Torre Wilson, which showed that he had several previous narcotics arrests and convictions, including felony narcotics convictions, and that the confidential informant identified Torre Wilson by photo as the person selling and storing fentanyl and crystal methamphetamine out of Room 315.  Thus, the affidavit was sufficient to establish probable cause for a warrant.  See May, 399 F.3d at 824, 825, 826 (finding that an affidavit was based on substantial information when the confidential informant's identity was known to the affiant officer, corroborating surveillance was conducted, and statement that the confidential informant had provided assistance in previous cases).

Defendant's contrary argument, that the affidavit provides "no details as to whether the detective made the buy personally or had another informant make the buy," and that the affidavit was unclear regarding "whether or not more than one buy was conducted by one or more informants within that five (5) day period," is not borne out by the document itself.  (ECF No. 39 at PageID 66.)  The search warrant was proper and thus Defendant's Motion to Suppress the evidence obtained from Room 315 is **DENIED**.

**II.    Defendant's Statements While in Custody**

Defendant next argues that his statements should be suppressed because he was interrogated at the police station prior to being Mirandized.  (ECF No. 39 at PageID 68.)  The

7

Government argues that, though he was in custody, Defendant was not interrogated prior to being Mirandized. (ECF No. 40 at PageID 81.) The Court agrees with the Government.

Defendant asserts that he was questioned before being Mirandized, which the Government does not dispute. However, he also argues that the questioning pertained to his own illicit activities, rather than general questioning about the area, as contended by the Government. (ECF No. 39 at PageID 68.) Despite his position, Defendant points the Court to no specific questions or statements from the first part of the questioning that were incriminating. (See id.) According to the Government, Detective Scott asked Defendant questions about the Sycamore View area and whether he knew certain people, but nothing about any incriminating criminal conduct. (ECF No. 40 at PageID 81.) Defendant offers no evidence to contradict the Government's position.

Defendant's testimony on this subject at the hearing was vague, to say the least. On direct examination, when asked what the detectives were asking him prior to the Miranda warning, Defendant stated that he was asked "three questions about the matter but they didn't get into it." (Hr'g Tr. 88.) On cross-examination, Defendant testified that he was told he needed to cooperate, and then that he was being asked "about stuff I don't know." (Hr'g Tr. 108.) He then testified that he was asked questions about "other people." (Hr'g Tr. 108.) Contrary to his testimony on direct, Defendant did not assert on cross-examination that he was asked any questions designed to elicit incriminating information.

In contrast, Detective Scott testified that, prior to giving the Miranda warning, Defendant volunteered information about a part of the Sycamore View area that was of interest to the MPD, and that the detectives otherwise asked Defendant general questions about how things were moving in the area and about major players, confirming information that the MPD already had.

(Hr'g Tr. 55–56.) He testified that he did not ask Defendant any incriminating questions about the incident giving rise to the underlying indictment or any other incidents during that time. Detective Scott's testimony did not deviate on cross-examination. (Hr'g Tr. 68, 71.) Defendant points to no information, other than his own vague testimony, that undermines Detective Scott's testimony.

Because the Court finds that Defendant's testimony was generally not credible and failed to contradict the Government's position with any detail, and finds that Detective Scott testified credibly, the Court concludes that no incriminating questions were posed during the pre-Miranda questioning. (Hr'g Tr. 88.) Thus, Miranda was not triggered and no violation occurred. United States v. Woods, 711 F.3d 737, 740 (6th Cir. 2013) ("The threshold issue is whether Woods was subjected to a custodial interrogation. In the absence of a custodial interrogation, the requirement to recite the Miranda warnings is not triggered and the analysis is at an end."). Defendant's Motion to Suppress his statements is **DENIED**.

## CONCLUSION

Because the search warrant was valid and Defendant was not interrogated prior to being Mirandized, Defendant's Motion to Suppress is **DENIED**.

**IT IS SO ORDERED,** this 7th day of April, 2021.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
UNITED STATES DISTRICT JUDGE
